**ORAL ARGUMENT NOT YET SCHEDULED**

**24-1172**
**(and consolidated case)**

# United States Court of Appeals for the District of Columbia Circuit

UNITED STATES STEEL CORPORATION,

*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents*,

On Petitions for Review of Final Action by the United States Environmental Protection Agency

## PROOF BRIEF FOR STATE AND LOCAL GOVERNMENT AND PUBLIC INTEREST RESPONDENT-INTERVENORS


BARBARA D. UNDERWOOD
*Solicitor General*
JUDITH N. VALE
*Deputy Solicitor General*
ELIZABETH A. BRODY
*Assistant Solicitor General*
MORGAN A. COSTELLO
CLAIBORNE E. WALTHALL
*Assistant Attorneys General*
*Environmental Protection Bureau*

*of Counsel*

LETITIA JAMES
*Attorney General*
*State of New York*
State Capitol
Albany, New York 12224
(518) 776-2400


Dated: October 22, 2024

(*Additional counsel listed on signature pages.*)

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

### A. Parties

Petitioners

The following parties appear as petitioners:

Case No. 24-1172: United States Steel Corporation

Case No. 24-1176: Hybar LLC

Respondents

The United States Environmental Protection Agency (EPA) and Michael S. Regan, EPA Administrator, are respondents in these consolidated cases.

Intervenors

There are no intervenor-petitioners in these matters.

Intervenor-respondents in these consolidated cases include: District of Columbia, State of Connecticut, State of Delaware, State of Illinois, State of Maryland, Commonwealth of Massachusetts, State of New Jersey, State of New York, Commonwealth of Pennsylvania, State

of Wisconsin, Air Alliance Houston, Appalachian Mountain Club, Center for Biological Diversity, Chesapeake Bay Foundation, Citizens for Pennsylvania's Future, Clean Air Council, Clean Wisconsin, Downwinders at Risk, Environmental Defense Fund, Harris County, Texas, Ohio Environmental Council, Sierra Club, Southern Utah Wilderness Alliance, and Utah Physicians for a Healthy Environment.

Amici

There are no amici in these matters.

**B. Ruling Under Review**

The agency action under review is entitled "Partial Denial of Petitions for Reconsideration: Federal 'Good Neighbor Plan' for the 2015 Ozone National Ambient Air Quality Standards," published at 89 Fed. Reg. 23526 (April 4, 2024).

**C. Related Cases**

Two actions challenging the same action under review have been filed in the Eighth Circuit and are currently in abeyance. *State of Arkansas, et al. v. EPA, et al.*, Case No. 24-2144 (8th Cir.); *Hybar LLC v. EPA, et al.*, Case No. 24-2145 (8th Cir.). The administrative record for EPA's rule entitled "Federal 'Good Neighbor Plan' for the 2015 Ozone

National Ambient Air Quality Standards," published at 88 Fed. Reg. 36654 (June 5, 2023) (Good Neighbor Rule) has been partially remanded to EPA, and twenty-three consolidated cases challenging the Good Neighbor Rule are currently in abeyance. *State of Utah v. EPA, et al.*, Case No. 23-1157 (D.C. Cir. Sept. 12, 2024) (ECF 2074472). In addition, a challenge to the Good Neighbor Rule by Petitioner Hybar LLC was filed in the Eighth Circuit and is currently in abeyance. *Hybar LLC v. EPA., et al.*, No. 23-2782 (8th Cir.). Ten consolidated cases pending before this Court but currently in abeyance address EPA's interim final rules temporarily suspending the Good Neighbor Rule in some states. *Nat'l Mining Ass'n v. EPA*, Nos. 23-1275, et al. (D.C. Cir.).

*/s/ Claiborne E. Walthall*
Claiborne E. Walthall
Assistant Attorney General
Office of the New York State
Attorney General
The Capitol
Albany, NY 12224

*Counsel for State Intervenor-Respondents*

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure and D.C. Circuit Rule 26.1, Air Alliance Houston, Appalachian Mountain Club, Center for Biological Diversity, Chesapeake Bay Foundation, Citizens for Pennsylvania's Future, Clean Air Council, Clean Wisconsin, Downwinders at Risk, Environmental Defense Fund, Ohio Environmental Council, Sierra Club, Southern Utah Wilderness Alliance, and Utah Physicians for a Healthy Environment state that they are non-profit environmental organizations without any parent corporation or stock.

Dated: October 22, 2024

*<u>/s/ Shaun A. Goho</u>*
Shaun A. Goho
Hayden W. Hashimoto
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(617) 678-2516
sgoho@catf.us
hhashimoto@catf.us

*Counsel for Citizens for Pennsylvania's Future, Clean Air Council, Clean Wisconsin, and Ohio Environmental Council*

/s/ Zachary M. Fabish
Zachary M. Fabish
Sierra Club
50 F Street NW, 8th Floor
Washington, DC 20001
(650) 388-8446
zachary.fabish@sierraclub.org

Joshua D. Smith
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5560
(415) 977-5704
joshua.smith@sierraclub.org

*Counsel for Sierra Club*

/s/ Seth L. Johnson
Seth L. Johnson
Kathleen L. Riley
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 797-5245
(202) 745-5227
sjohnson@earthjustice.org
kriley@earthjustice.org

*Counsel for Air Alliance Houston, Appalachian Mountain Club, Center for Biological Diversity, Chesapeake Bay Foundation, Downwinders at Risk, Sierra Club, Southern Utah Wilderness Alliance, and Utah Physicians for a Healthy Environment*

/s/ Megan M. Herzog
Megan M. Herzog
Sean H. Donahue
Donahue & Goldberg, LLP
1008 Pennsylvania
Washington, DC 20003
(650) 353-8719
megan@donahuegoldberg.com
sean@donahugoldberg.com

Vickie L. Patton
Noha Haggag
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO 80302
(202) 572-3286
vpatton@edf.org
nhaggag@edf.org

*Counsel for Environmental Defense Fund*

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..... i

Rule 26.1 DISCLOSURE STATEMENT ..... iv

TABLE OF CONTENTS ..... vi

TABLE OF AUTHORITIES ..... viii

GLOSSARY ..... xi

PRELIMINARY STATEMENT ..... 1

PERTINENT STATUTES AND REGULATIONS ..... 3

STATEMENT OF THE CASE ..... 4

A. Interstate Ozone Pollution and the Good Neighbor Provision ..... 4

B. Disapproval of State Plans ..... 5

C. The Good Neighbor Rule ..... 6

D. This Litigation ..... 7

E. Subsequent Developments in Related Litigation ..... 11

SUMMARY OF ARGUMENT ..... 12

ARGUMENT ..... 13

POINT I ..... 13

EPA CORRECTLY DENIED ADMINISTRATIVE RECONSIDERATION ..... 13

A. EPA Correctly Applied the Central Relevance Standard. ..... 13

B. The Judicial Stays Are Not Centrally Relevant..................... 18

1. The "uniform" aspects of the Rule remain reasonable notwithstanding the judicial stays. .............. 19

2. Petitioners' arguments about specific methodological steps in the Rule do not raise issues of central relevance. ........................................................ 25

POINT II ........................................................................................ 33

PETITIONERS ARE NOT ENTITLED TO THE REMEDIES THEY SEEK ......... 33

CONCLUSION ............................................................................ 38

CERTIFICATE OF COMPLIANCE........................................................ 43

CERTIFICATE OF SERVICE............................................................... 43

STATUTORY AND REGULATORY ADDENDUM ............................... 44

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ........ 34

*Bryant v. Gates*,
532 F.3d 888 (D.C. Cir. 2008) ........ 21

*Chesapeake Climate Action Network*, 952 F.3d 310 (D.C. Cir. 2020) ........ 17-18

*Coalition for Responsible Regulation, Inc. v. EPA*,
684 F.3d 102 (D.C. Cir. 2012), *aff'd in part, rev'd in part on other grounds sub nom., Utility Air Regulatory Grp. v. EPA*,
573 U.S. 302 (2014) ........ 13-14, 15-16

*EME Homer City Generation, L.P. v. EPA*,
795 F.3d 118 (D.C. Cir. 2015) ........ 22

*EPA v. EME Homer City Generation, L.P.*,
572 U.S. 489 (2014) ........ 4, 20-21, 35

*Kennecott Corp. v. EPA*,
684 F.2d 1007 (D.C. Cir. 1982) ........ 17

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024) ........ 21

*Michigan v. EPA*,
213 F.3d 663 (D.C. Cir. 2000) ........ 22

*North Carolina v. EPA*,
531 F.3d 896 (D.C. Cir. 2008) ........ 4, 21, 35

*North Carolina v. EPA*,
550 F.3d 1176 (D.C. Cir. 2008) ........ 35

*Ohio v. EPA*,
144 S. Ct. 2040 (2024) .......... 11-12, 26

*Oljato Chapter of the Navajo Tribe v. Train*,
515 F.2d 654 (D.C. Cir. 1975) .......... 16

*Portland Cement Ass'n v. EPA*,
665 F.3d 177 (D.C. Cir. 2011) .......... 33

*Wisconsin v. EPA*,
938 F.3d 303 (D.C. Cir. 2019) .......... 4-5, 21, 34-35, 37

**Federal Statutes**

42 U.S.C. § 7409(d) .......... 4

42 U.S.C. § 7410(a)(1) .......... 5

42 U.S.C. § 7410(a)(2)(D)(i) .......... 21

42 U.S.C. § 7410(a)(2)(D)(i)(I) .......... 5, 23

42 U.S.C. § 7410(c)(1) .......... 5-6, 35

42 U.S.C. § 7410(k)(1) .......... 35

42 U.S.C. § 7410(k)(2) .......... 35

42 U.S.C. § 7410(k)(3) .......... 5, 35

42 U.S.C. § 7410(k)(4) .......... 35

42 U.S.C. § 7410(k)(5) .......... 35

42 U.S.C. § 7410(l) .......... 23

42 U.S.C. § 7511 .......... 4

42 U.S.C. § 7607(b)(1) .......... 6

42 U.S.C. § 7607(d)(7)(B) .......... 1, 8, 13-14, 33-34

**Federal Regulations**

40 C.F.R. § 50.19 (b) ........ 37

40 C.F.R. § 50.19 (d) ........ 37

63 Fed. Reg. 57356 (Oct. 27, 1998) ........ 32

69 Fed. Reg. 21604 (Apr. 21, 2004) ........ 22

73 Fed. Reg. 21528 (Apr. 22, 2008) ........ 22

74 Fed. Reg. 56721 (Nov. 3, 2009) ........ 22

76 Fed. Reg. 80760 (Dec. 27, 2011) ........ 22

80 Fed. Reg. 65292 (Oct. 26, 2015) ........ 5

82 Fed. Reg. 1733 (Jan. 6, 2017) ........ 6

88 Fed. Reg. 9336 (Feb. 13, 2023) ........ 6-7

88 Fed. Reg. 36654 (June 5, 2023) ........ 4, 6, 19, 23, 28-29, 31, 36

88 Fed. Reg. 67102 (Sept. 29, 2023) ........ 7

89 Fed. Reg. 23526 (Apr. 4, 2024) ........ 9

89 Fed. Reg. 61025 (July 30, 2024) ........ 36

**Miscellaneous Authorities**

EPA, Nonattainment Areas for Criteria Pollutants (Green Book), 8-Hour Ozone (2015), Designated Area/State Information (current as of Sept. 30, 2024), https://www3.epa.gov/airquality/greenbook/jbtc.html ........ 36

H.R. Rep. No. 95-294 ........ 16

## GLOSSARY

| | |
|---|---|
| Act | Clean Air Act |
| Denial | Enclosure: The EPA's Basis for Partially Denying Petitions for Reconsideration of the Good Neighbor Plan on Grounds Related to Judicial Stays of the SIP Disapproval Acton as to 12 States, EPA-HQ-OAR-2021-0668-1255 |
| EPA | United States Environmental Protection Agency |
| FIP | federal implementation plan |
| Good Neighbor Rule or Rule | Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 36,654 (June 5, 2023) |
| NOx | nitrogen oxides |
| OTPA | Ozone Transport Policy Analysis Final Rule Technical Support Document, EPA-HQ-OAR-2021-0668-1080 |
| ppb | parts per billion |
| RIA | Regulatory Impact Analysis, EPA-HQ-OAR-2021-0668-1115 |
| SIP | state implementation plan |

## PRELIMINARY STATEMENT

In this action, Petitioners ask this Court to overturn EPA's decision not to convene a post-rulemaking administrative proceeding to reconsider parts of its recent, comprehensive regulation on cross-state air pollution (the "Good Neighbor Rule" or "Rule"). The Clean Air Act authorizes reconsideration of a rule in response to a post-rulemaking objection only where, among other things, the objection is "of central relevance to the outcome of the rule." 42 U.S.C. § 7607(d)(7)(B). Because Petitioners failed to meet that standard, this Court should confirm EPA's decision not to convene a reconsideration proceeding.

Petitioners sought reconsideration after several circuit courts stayed parts of a predicate rulemaking, which had the effect of temporarily pausing the Good Neighbor Rule's enforcement in twelve out of twenty-three States. Petitioners argued that those stays prohibited EPA from publishing in the Federal Register any provisions related to the twelve States with judicial stays. Separately, Petitioners also argued that the stays undermined the Rule's design because critical aspects of

EPA's methodology purportedly rested on the assumption that the Rule would apply in twenty-three States.

For the reasons explained in EPA's brief, Petitioners' first argument fails. See EPA Br. at 14-33. Respondent-Intervenors[1] write to further explain why Petitioners' second argument misconceives the Rule's structure and methodology. Petitioners incorrectly assume that EPA crafted a unitary Rule under which one State's pollution control responsibilities fundamentally depend on all other States'. But consistent with its historical—and judicially upheld—practice, EPA in fact designed a modular Rule, which States can enter and leave without affecting the pollution control responsibilities of any other State. Accordingly, Petitioners do not and cannot identify any aspect of the Rule's methodology that turns on the Rule's application to twenty-three States and that affected the outcome of the Rule. Finally, while Petitioners ask

[1] Respondent-Intervenors are two coalitions filing jointly: a coalition of state and local governments and a coalition of public interest organizations.

this Court to vacate the underlying Rule, the Clean Air Act does not authorize such relief in connection with a reconsideration proceeding.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations not in the addenda for Petitioners and the EPA Respondents are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Interstate Ozone Pollution and the Good Neighbor Provision

Because ozone pollution poses major health threats, *see* 88 Fed. Reg. 36654, 36658 (June 5, 2023), EPA periodically sets air-quality standards that establish a maximum permissible level of ozone in the ambient air, *see* 42 U.S.C. § 7409(d). The Clean Air Act requires each State to achieve these standards within its borders by certain statutory deadlines, *see* 42 U.S.C. § 7511, even if large amounts of ozone inside the State originate from sources in other States. *North Carolina v. EPA*, 531 F.3d 896, 910 (D.C. Cir. 2008) (per curiam). Such cross-state pollution occurs when power plants, industrial facilities, and other sources in upwind States emit ozone-forming pollutants that prevailing winds carry into downwind States. Downwind States lack legal authority to control sources in upwind States, and instead must offset upwind pollution by increasing regulation of in-State sources. Residents of downwind States also suffer health harms from pollutants from upwind States. *See EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 519-20 (2014); *Wisconsin v. EPA*, 938 F.3d 303, 309 (D.C. Cir. 2019) (per curiam).

Congress added the Good Neighbor Provision to the Act to address this inequity. *See Wisconsin*, 938 F.3d at 309. When EPA sets an air-quality standard for ozone (or another pollutant), each State must submit a state implementation plan (SIP) that ensures that State will attain the standard within its own borders, *see* 42 U.S.C. § 7410(a)(1). Under the Good Neighbor Provision, a SIP must also prohibit emissions from that State's sources in amounts that "contribute significantly to nonattainment" or "interfere with maintenance" of the standard in any other State, *id.* § 7410(a)(2)(D)(i)(I).

EPA must review each State's SIP for substantive compliance and may approve a SIP only "if it meets all of the applicable requirements of" the Act, including the Good Neighbor Provision. *Id.* § 7410(k)(3). If a SIP does not adequately curb the export of pollution into other States, EPA must disapprove that SIP and, no later than two years after disapproval, issue a federal implementation plan (FIP). *Id.* § 7410(c)(1).

**B. Disapproval of State Plans**

In 2015, EPA strengthened the ozone air-quality standard and set deadlines for States to achieve this more stringent standard. 80 Fed. Reg.

65292 (Oct. 26, 2015). EPA's modeling projected that pollution from approximately two dozen upwind States would impair several downwind States' ability to attain or maintain the updated standard. *See* 82 Fed. Reg. 1733, 1739-40 (Jan. 6, 2017). But many upwind States failed to propose any emissions reductions in their SIPs. EPA reviewed and disapproved twenty-one SIPs for failing to satisfy the Good Neighbor Provision. 88 Fed. Reg. 9336 (Feb. 13, 2023) ("SIP Disapproval Rule").

States and industry filed petitions in eight circuit courts challenging the SIP Disapproval Rule, though the Act requires that petitions for review of regulations that are "nationally applicable" or are based on a determination of nationwide scope or effect be filed only in the D.C. Circuit. *See* 42 U.S.C. § 7607(b)(1).

### C. The Good Neighbor Rule

The SIP Disapproval Rule triggered EPA's statutory duty to issue a replacement FIP for each State that submitted an inadequate SIP. *See id*. § 7410(c)(1). In March 2023, EPA finalized the Good Neighbor Rule, which contains FIPs for these twenty-one States, plus two States that had not submitted SIPs, for a total of twenty-three States. 88 Fed. Reg.

at 36654. Several States and industry petitioners challenged the Rule in this Court. *See Utah v. EPA*, No. 23-1157 (D.C. Cir.).

Beginning in May 2023, several circuit courts hearing challenges to the SIP Disapproval Rule temporarily stayed EPA's disapproval of twelve States' SIPs pending merits review. EPA agreed that these judicial stays paused the Rule's application in those States and promptly issued regulations staying the effectiveness of the Rule as to those twelve States. *See, e.g.,* 88 Fed. Reg. 67102, 67103 (Sept. 29, 2023).

### D. This Litigation

In August 2023, after some judicial stays had been entered, Petitioners United States Steel Corporation (U.S. Steel), Hybar LLC (Hybar), and other parties filed petitions with EPA seeking an administrative stay and administrative reconsideration of the Good Neighbor Rule. U.S. Steel Petition, EPA-HQ-OAR-2021-0668-1242 (U.S. Steel Pet.) [JA___- ___]; Hybar LLC Petition, EPA-HQ-OAR-2021-0668-1236 (Hybar Pet.) [JA___-___]. The Act requires EPA to convene a reconsideration proceeding—i.e., to reopen the challenged aspect of the underlying rulemaking with notice-and-comment—(i) if a petitioner

raises an objection based on grounds that arose after the period for public comment, but during the period for judicial review, and (ii) if such objection "is of central relevance to the outcome of the rule." 42 U.S.C. § 7607(d)(7)(B).

As relevant here, U.S. Steel broadly asserted that the judicial stays, which arose after the public-comment period closed, disrupted the uniform scheme on which the Rule purportedly rested. U.S. Steel also vaguely asserted that some steps in EPA's methodological framework for the Rule depended on the Rule's eventual application to twenty-three States. U.S. Steel Pet. 6-9 [JA__-__]. Hybar asserted that the Rule, which included Arkansas when it was published in the Federal Register, was promulgated illegally because a circuit court had temporarily stayed EPA's disapproval of Arkansas's SIP prior to publication. Hybar Pet. 3-5 [JA__-__].

In April 2024, EPA published notice that it was denying U.S. Steel's and Hybar's petitions as to the judicial stays.[2] 89 Fed. Reg. 23526 (Apr. 4, 2024). In an enclosure, EPA explained that although the objections concerning judicial stays arose after the public-comment period and within the period for judicial review, the petitions did not meet the second statutory requirement for reconsideration because these objections were not centrally relevant to the outcome of the Rule. Basis for Partial Denial of Petitions for Reconsideration, EPA-HQ-OAR-2021-0668-1255 (Denial) [JA___-___]. As to U.S. Steel's petition, EPA explained that the temporary suspension of the Rule's requirements in some States—which EPA had done to comply with the judicial stays—did not provide a lawful basis to suspend the Rule's requirements in other States. Denial 3 [JA__]. EPA explained that suspending the Rule in States that had failed to submit a SIP or that had lawfully disapproved SIPs (and for which the

[2] In the notice, EPA made two additional determinations not relevant here. First, EPA denied in part two other petitions that raised similar issues. 89 Fed. Reg. at 23526. Those parties did not seek review in this Court. Second, EPA deferred decision on objections unrelated to the judicial stays. *Id.*

period for judicial review had expired) would violate EPA's statutory obligation to promulgate FIPs. *Id.* EPA further explained that the Rule regulated sources, not States, and that sources' obligations did not change depending on how many States were subject to the Rule. Moreover, EPA emphasized, the Rule could be implemented in any subset of States. Denial 2-10, 33-34 [JA__-__, __-__]. And EPA walked through its methodology step-by-step to demonstrate that it does not depend on the number of States it covers. Denial 11-31 [JA__-__].

As to Hybar's argument, EPA explained that the Rule's inclusion of Arkansas, which was covered by a temporary judicial stay when the Rule was published in the Federal Register, did not render the Rule unlawful. Denial 36-38 [JA__-__]. EPA explained that Arkansas's stay provided no reason to modify a fully severable Rule and that EPA had taken other action to exempt Arkansas. Denial 36 [JA__]. EPA also disagreed that the Rule had been promulgated unlawfully. Denial 36-37 [JA__-__].

Petitioners sought judicial review of EPA's decision to deny reconsideration.

## E. Subsequent Developments in Related Litigation

In the litigation seeking review of the Good Neighbor Rule itself, petitioners sought stays, which this Court denied. *See* Order, *Utah* (Sept. 25, 2023), #2018645; Order, *Utah* (Oct. 11, 2023), #2021268. In October 2023, some petitioners applied to the Supreme Court for emergency stays.

The Supreme Court granted a stay of the Rule in June 2024. *Ohio v. EPA*, 144 S. Ct. 2040, 2058 (2024). The Court reasoned that comments on the proposed Rule had questioned the viability of the Rule if the number of covered States changed, *id.* at 2050-51, and that EPA had likely acted arbitrarily and capriciously by failing to respond to such comments, *id.* at 2054. Four justices dissented, noting that any failure to adequately respond to the comments the Court had identified was likely harmless because the Rule appeared to be severable state-by-state, *Ohio*, 144 S. Ct. at 2068-69 (Barrett, J., dissenting).

By the time the Supreme Court issued its decision, EPA had denied U.S. Steel's and Hybar's reconsideration petitions. However, the Court did not view EPA's denial as relevant to the stay applications and

explained that the Court had not considered the Denial in reaching its decision. *Ohio*, 144 S. Ct. at 2055 n.11.

This Court subsequently ordered a partial remand of the record for EPA to respond to the comments that the Supreme Court had identified and put the Rule litigation into abeyance during remand. *See* Order, *Utah* (Sept. 12, 2024), #2074472. The Court also ordered that the Rule litigation and this reconsideration litigation be calendared for argument before the same panel on the same day. *Id.*

## SUMMARY OF ARGUMENT

I. EPA correctly denied the petitions for administrative reconsideration. Petitioners are incorrect that EPA must grant reconsideration whenever an objector purports to raise an issue of central relevance. Instead, the statute requires EPA to assess the objection in the first instance to determine whether the objection, if valid, would change the rule's outcome.

Here, EPA correctly determined that the temporary stays were not centrally relevant to the Rule's outcome because the Rule consists of independent requirements for the sources in each State and because

neither the Rule's methodology nor its obligations depend on the original number of covered States.

II. Petitioners are not entitled to reversal and remand of EPA's denial of reconsideration or to outright vacatur of the Rule, which would risk further delay and uncertainty for downwind States and their residents, who are already suffering the loss of vital, long-overdue reductions in pollution from upwind States.

## ARGUMENT

## POINT I

## EPA Correctly Denied Administrative Reconsideration

### A. EPA Correctly Applied the Central Relevance Standard.

As pertinent here, the standard for mandatory reconsideration under the Clean Air Act is "central relevance," 42 U.S.C. § 7607(d)(7)(B), i.e., whether the objections raised in a petition would "provide substantial support for the argument that the regulation should be revised." *Coalition for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 124 (D.C.

Cir. 2012), *aff'd in part, rev'd in part on other grounds sub nom. Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014).

Petitioners concede that central relevance is determined by whether the objections provide substantial support for revision of the regulation (Br. for Pet'rs (Br.) 18), but argue that petitioners need only raise an objection that they assert is centrally relevant to the rulemaking (*id.* at 16 ("once such objection is raised, EPA is obligated to grant reconsideration")). Petitioners further argue that EPA lacks authority to examine whether such an objection, if correct, would provide a basis to modify or withdraw the rule. *Id.* at 18. Petitioners are mistaken.

The Act's plain language requires that an objection must be centrally relevant "to the outcome of the rule" to warrant reconsideration. 42 U.S.C. § 7607(d)(7)(B). It is not enough for a petitioner to simply assert central relevance. Here, Petitioners' objections relied on the stays that temporarily changed the number of States currently covered by the Rule. EPA properly looked to the impacts from the stays and concluded that Petitioners' objections based on the number of States covered by the Rule were not centrally relevant because "the obligations set for sources in

each state are independent of the number of states included in the [Rule].” Denial 1 [JA__].

Petitioners’ contrary interpretation (Br. 18) would needlessly reopen the rulemaking for otherwise final rules that, like the Rule here, provide important health protections. That outcome would be contrary to the Act’s text and structure, which reserves reconsideration proceedings for significant after-arising objections—not for any colorable objection that a petitioner might raise. The Act’s requirement that objections raised in a reconsideration petition be centrally relevant to the *outcome* of the rule would be meaningless if all Congress required were a petitioner’s self-serving assertion of central relevance, with no role for EPA to screen out objections that, even if correct, are not centrally relevant to the rule’s outcome.

Precedent confirms this approach. For example, in *Coalition for Responsible Regulation*, the petitioners sought reconsideration on the basis that certain new documents and scientific studies undermined EPA’s finding that greenhouse gases endanger public health and welfare. 684 F.3d at 125. EPA concluded that none of the minor errors identified

by those documents or studies was sufficiently material to affect the overall evidentiary support for EPA's finding. *Id.* This Court concluded that EPA properly denied reconsideration because the petitioners there had "not provided substantial support for their argument that the [regulation] should be revised." *Id.*

Legislative history further demonstrates that Congress did not intend for EPA to automatically initiate a disruptive reconsideration process—with notice, comment, and a potential three-month stay of the underlying rule—each time a petitioner merely raises an objection. When Congress amended the Act in 1977 to add the reconsideration provision, it intended that "the Agency must first be given an *opportunity to pass on the significance of the materials* and determine whether supplementary proceeding[s] are called for or not." H.R. Rep. No. 95-294 at 323 (emphasis added). Indeed, the statute was amended in part to codify this Court's decision in *Oljato Chapter of the Navajo Tribe v. Train*, 515 F.2d 654 (D.C. Cir. 1975), which held that EPA must substantively assess and explain its reasons for denying a petition. *Id.* at 667.

Relying on two cases, *Chesapeake Climate Action Network*, 952 F.3d 310, 322 (D.C. Cir. 2020), and *Kennecott Corp. v. EPA*, 684 F.2d 1007, 1019-20 (D.C. Cir. 1982), Petitioners argue that EPA erred by considering the merits of their reconsideration petitions. *See* Br. 19. But EPA did not do so, and neither of the two cases Petitioners rely on supports their argument. In neither of those cases did the court object to EPA's authority to assess the reconsideration petitions for central relevance. Instead, those cases merely show instances where the court disagreed with EPA's conclusions about the central relevance of the issues raised. Unlike the circumstances here, both of those cases concerned data that would have altered calculations or conclusions central to the rule at issue. In *Kennecott*, the Court found that EPA's denial of the reconsideration petition was not a substitute for a full reconsideration proceeding because EPA had relied on new economic forecast data to finalize regulations, and the objections to that data, "if well-founded," could have changed eligibility for certain relief under the regulations. 684 F.2d at 1019. Similarly, in *Chesapeake*, the objections concerned data presented for the

first time in the final rule—and different data would have required recalculating a determination central to the regulation. 952 F.3d at 322.

Here, in contrast, the objections did not claim that EPA had relied on new or different data, unavailable during the comment period, in finalizing the Rule. Instead, the objections noted that the judicial stays temporarily changed the number of States covered by the Rule. EPA reasonably explained why this temporary change would not change the outcome of the Rule. See *infra* 19-33; EPA Br. 18-33. Thus, EPA did not improperly assess the merits of the petitions without following reconsideration procedures, but instead determined that the objections raised were not centrally relevant to the Rule's outcome and did not qualify for reconsideration.

## B. The Judicial Stays Are Not Centrally Relevant.

Petitioners make two types of arguments about why the judicial stays are centrally relevant to the Rule's outcome.[3] Neither has merit.

---

[3] EPA has already fully addressed any objections regarding the Rule's publication after judicial stays. *See* EPA Br. 18-36.

### 1. The "uniform" aspects of the Rule remain reasonable notwithstanding the judicial stays.

Petitioners incorrectly argue that the judicial stays, which temporarily decreased the number of States covered by the Rule, disrupted a fundamental premise of the Rule. They argue that EPA may impose a uniform level of pollution control ("control stringency") across upwind States only when regulating many of the collectively contributing upwind States or a substantial amount of cumulative upwind pollution, to ensure the selected control stringency is equitable across States. *See* Br. 43-46. But Petitioners' unsupported argument is meritless because the decision to impose uniform levels of control stringency on sources in upwind States is a longstanding approach, upheld by the Supreme Court, that does not depend on the number of States covered by a given good-neighbor rule.

Over the course of three decades, EPA's good-neighbor rules have applied to anywhere from twelve to twenty-nine States (including the District of Columbia) at promulgation, and, for many of these rules, the number of States covered changed over time. *See* Denial 27 n.28, 29 [JA__, __]; 88 Fed Reg. at 36668-69. In each of these rules, EPA has

identified a “common, uniform level of emissions control stringency” for each type of source (e.g., power plant, glass furnace) based on the cost-effectiveness of widely available pollution-control strategies—independent of which States are covered. Using a uniform stringency level addresses a persistent externality problem because with that approach sources in downwind States that have already invested more in pollution controls have to shoulder fewer additional costs associated with mitigating pollution from upwind neighbors that “have done relatively less in the past to control their pollution.” *EME Homer,* 572 U.S. at 519. These externalities exist regardless of the number of upwind States covered when a rule is initially promulgated or as that number changes over time.

Moreover, Petitioners misapprehend how this uniform aspect of the Rule works. As in prior good-neighbor rules, the uniform control stringencies in this Rule are applied to the particular mix of sources in each State to produce *source-specific* obligations that are “independent of the number or scope of included states.” Denial 2-3, 10, 31-34 [JA_-_, __, __-__]; *see id.* 31-34 [JA__-__]. *Contra* Br. 43. Thus, no source’s emissions-

control obligation depends on others, though all are calculated under the same methodology. This approach aligns with EPA's statutory duty to ensure that each State is responsible for its *own* contribution of pollution to downwind States' attainment problems.[4] *See* 42 U.S.C. § 7410(a)(2)(D)(i); *Wisconsin*, 938 F.3d at 324-325; *North Carolina,* 531 F.3d at 906-08, 920-21.

Indeed, this Court and the Supreme Court have upheld EPA's use of a uniform level of control stringency even if particular States are removed from coverage. *See EME Homer*, 572 U.S. at 519, 523-24. In *EME Homer,* the Supreme Court ruled that an upwind State that believes its sources are overcontrolled by EPA's application of uniform control stringencies may "bring a particularized, as-applied challenge" to such a rule. *Id.* at 524. The Court's focus on as-applied challenges contemplated that a challenge to a good-neighbor rule's requirements in one State does not necessarily invalidate the rule's application in

[4] Petitioners suggest in passing that *Loper Bright Enterprises v. Raimondo,* 144 S. Ct. 2244 (2024), may implicate EPA's longstanding and court-affirmed approach. Br. 43-44. This argument is forfeited. *See Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008).

another. *See also EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 127, 129-30, 132 (D.C. Cir. 2015) (on remand, finding rule's requirements invalid for eleven of twenty-six originally covered States, without altering requirements for remaining States). Similarly, this Court remanded and vacated EPA's inclusion of three States in a prior good-neighbor rule—without having that excision bring down the whole rule. *See Michigan v. EPA*, 213 F.3d 663, 681-85 (D.C. Cir. 2000) (remanding and vacating inclusion of Wisconsin, Georgia, and Missouri in cross-state ozone rule).

Petitioners give no reason for a different outcome here, and there is none. Accommodating shifts in State coverage has been a core aspect of the design and function of good-neighbor rules since the first rule in 1998.[5] The Act *requires* that such shifts be allowed, providing that States may "develop a SIP revision to replace a transport FIP and submit that

---

[5] *See, e.g.*, 69 Fed. Reg. 21604, 21608-09 (Apr. 21, 2004) (excluding Wisconsin and portions of Georgia, Missouri, Alabama, and Michigan from rule); 73 Fed. Reg. 21528 (Apr. 22, 2008) (removing Georgia from rule); 74 Fed. Reg. 56721 (Nov. 3, 2009) (staying rule as to Minnesota); 76 Fed. Reg. 80760 (Dec. 27, 2011) (adding five States to existing rule's allowance-trading program).

to the EPA for approval." 88 Fed. Reg. at 36839; *see* 42 U.S.C. § 7410(a)(2)(D)(i)(I), 7410(l). Where such a SIP-revision is approved, the State exits a FIP and necessarily reduces the number of States covered by that good-neighbor rule. And the current Rule, like prior good-neighbor rules, expressly contemplated that any State may exit by adopting an approvable state plan. *See* 88 Fed. Reg. at 36839-42.

EPA also expressly contemplated that States might be *added* to the Rule. The Rule stated that EPA was deferring action on six States, recognizing that the Rule may eventually expand and cover twenty-nine States. *Id*. at 36656, 36658. And the Rule itself amended and added new States to an existing emissions allowance-trading program, established by a prior cross-state ozone rule, which has covered different numbers of States over time. *See id*. at 36657. Thus, the Rule was designed so that increases or decreases to the number of covered States *would not affect* the requirements for sources in States initially covered by the Rule. Accordingly, as under prior good-neighbor rules, when States enter or exit the program, the "emissions reduction obligations of the states remaining in the Plan remain exactly the same, and the obligations of

states joining the Plan are set by the same rules." Denial 3 [JA__]; *see also id.* at 31-34 [JA__-__].

Petitioners also miss the mark, Br. 45-46, in arguing that the judicial stays might lead to cross-state "emission shifting" by private industry—i.e., prompting industry to relocate to or increase production in an upwind State shielded by a stay. *See* EPA Br. 44-45.

EPA's framework does not require the agency to avoid "emission shifting" at all costs. *See* Br. 45. To the contrary, some degree of shifting is always possible because good-neighbor rules have never covered all fifty States (many States do not contribute significantly to downwind States' nonattainment) and thus have always contemplated different degrees of regulation among States. For example, this Rule covered Alabama because it significantly contributed pollution to Galveston, Texas, but did not cover the neighboring States of Florida and Georgia, which did not significantly contribute pollution to downwind areas. EPA, Air Quality Modeling Final Rule TSD, EPA-HQ-OAR-2021-0668-1157 (AQMF) C-2 [JA___]. And although the absence of the Rule's obligations could conceivably make Florida or Georgia more attractive to industry,

that lack of uniformity did not (and legally could not) prevent EPA from regulating Alabama. Moreover, although the Rule was in effect in States not subject to a judicial stay for eleven months, including portions of both the 2023 and 2024 summer "ozone seasons," Petitioners identify no harmful effects stemming from disparate regulatory requirements in the States where the Rule was stayed and the States where it was enforced.

### 2. Petitioners' arguments about specific methodological steps in the Rule do not raise issues of central relevance.

Petitioners next assert that the judicial stays, and hence the number of States ultimately included in the Rule, were centrally relevant to certain steps EPA took to craft the Rule. *See* Br. 46-54. As an initial matter, the only Petitioner that raised this issue in its administrative petition did not articulate in detail how the stays, and hence the number of States, were purportedly centrally relevant to any specific aspect of the Rule's methodology. *See* Denial 8 [JA__]. Nevertheless, in the interest of "fully resolving" the issue, EPA walked through each aspect of the Rule's methodology and explained why the number of covered States was not centrally relevant. *See* Denial 8, 11-31 [JA__, __-__]. EPA's detailed

explanation refutes the five arguments Petitioners raise here, for the first time on judicial review.[6]

*First*, Petitioners erroneously contend that EPA selected which non-power-plant ("non-EGU") industries would be covered by the Rule based on data from the twenty-three States anticipated to be covered by the Rule. *See* Br. 48-49. In fact, EPA selected which non-EGU industries it would regulate by studying emissions from the twenty-seven States that were included in EPA's ozone good-neighbor rule from 2021. Denial 24 & n.26 [JA__]; Technical Memorandum: Screening Assessment, EPA-HQ-OAR-2021-0668-0150 (Screening Assessment) 1-3 [JA__-__]. EPA explained that the "lengthy" rulemaking process made it both appropriate and necessary to rely on this prior dataset to screen non-EGU industries for further analysis. Screening Assessment 1-3 [JA__-__]. The results of this study indicated that EPA should focus on nine

[6] Petitioners incorrectly contend (at 40-41) that the Supreme Court has already held that the number of covered States is centrally relevant. To the contrary, the Court cautioned that, with respect to whether EPA's methodology was specific to twenty-three States, it did "not profess answers." *Ohio*, 144 S. Ct. at 2057 n.14.

industries, including iron and steel—an industry with high nitrogen-oxide emissions. *See* Screening Assessment 3, 25 [JA__, __]. EPA then "retained the impactful industries identified in" this study, including iron and steel, for the remainder of its screening process. *See* Screening Assessment 6 [JA__].

*Second*, Petitioners argue that the Rule's cumulative air quality benefits and EPA's confirmatory "knee-in-the-curve" analysis would have looked different with a subset of States. *See* Br. 46-48, 52-53. But the Rule is not premised on achieving a certain level of cumulative air quality benefits. Denial 17 [JA__]. And Petitioners' argument incorrectly assumes that EPA's knee-in-the-curve analysis was limited to twenty-three States, and therefore would have needed to change if the Rule's scope changed. Instead, the knee-in-the-curve analysis in the Rule included twenty-eight States: all upwind States that were linked to ozone problems, "not just those covered by a particular. . .rulemaking," and all

"home" States containing problematic ozone receptors.[7] Denial 18-19 & n.22 [JA__-__]. EPA explained that analyzing twenty-eight States properly reflected the Act's requirement that all linked and home States do their fair share to control pollution, either through their own enforceable SIPs or as part of a federal rule. Denial 18-19 [JA__-__]; *see* Ozone Transport Policy Analysis Final Rule TSD, EPA-HQ-OAR-2021-0668-1080 (OTPA) 46-47, 55-56 [JA__-__, __-__]. Accordingly, this analysis would have remained the same even if States exited the Rule—a scenario, as noted above, that the Rule expressly contemplated. *See* 88 Fed. Reg. at 36841-42. See *supra* at 23-24.

In any event, the Denial demonstrates that even a counterfactual knee-in-the-curve analysis based on a subset of States—which EPA prepared "solely for purposes of responding to the Petitions," Denial 19 [JA__]—would not have changed the ultimate choices that EPA made in the Rule. *See* Br. 46-48, 52-53. That is because Petitioners' argument

---

[7] In fact, EPA modeled an alternative air-quality comparison approach based on just the twenty-three States in the Rule but ultimately rejected this approach. OTPA 56 [JA__].

rests on a fundamental misconception about the role of the knee-in-the-curve analysis. At bottom, this exercise seeks to confirm that the measures EPA has already selected will result in meaningful improvements downwind without being unreasonably costly. Denial 14, 19-21 [JA__, __-__]. As EPA explained, the knee-in-the-curve is "not on its own a justification," but rather "a useful indicator for informing potential stopping points." 88 Fed. Reg. at 36741 (quotation marks omitted). The eleven-State graph in the Denial confirms that the measures EPA had already selected for the Rule still delivered meaningful improvements downwind and were not unreasonably costly, even when applied to a subset of States, because these measures appear as points on the earlier, steeper portion of the benefit-cost curve, well before the inflection point (the "knee"). Denial 19-22 [JA__-__].

*Third*, Petitioners note that EPA calculated a weighted average cost associated with retrofitting industrial boilers and hypothesize, without support, that this average might have skewed higher if EPA had used data from a subset of States. *See* Br. 49-50. But even assuming Petitioners are correct, any cost shift would not have caused EPA to

change any of the Rule's requirements. EPA first chose boiler technologies that were commercially mature, highly effective, and already used by sources in downwind States. EPA then calculated costs for each covered boiler to arrive at a weighted average cost.[8] *See* Denial 14, 26 [JA__, __]. After compiling the retrofit costs that were used to calculate the weighted average, EPA observed that costs could approach $15,000 per ton for some boilers but did not determine that such costs rendered the selected technologies unreasonable. As EPA concluded, such costs were comparable to the upper end of costs that the Rule imposes on some power plants—specifically, up to $20,900 per ton. *See* Denial 26 [JA__]; Technical Memorandum: Summary of Final Rule Applicability Criteria and Emissions Limits for Non-EGU Emissions Units, EPA-HQ-OAR-2021-0668-0956 (Non-EGU Summary) 10 [JA___].

---

[8] As the Denial explains, EPA was required to "weight" the costs for boilers not because there were twenty-three States in the Rule but because boilers use different control technologies, and therefore carry different costs, depending on their fuel. For example, coal- and oil-powered boilers use selective catalytic reduction, whereas natural-gas-powered boilers use low-nitrogen-oxide burners and flue-gas recirculation. *See* Denial 13, 26 [JA__, __]; Non-EGU Summary 5 [JA__].

And other boilers, such as those in the iron and steel industry, would have costs closer to $8,400 per ton. Non-EGU Summary 10 [JA__]. Thus, even if the *average* cost for boiler retrofits had been closer to $15,000 per ton, EPA would not have determined that boiler retrofits—much less iron and steel boiler retrofits—were too costly a strategy for the Rule.

Further, EPA did not use the weighted average cost for each non-EGU source category, e.g. boilers, to study air quality benefits or to conduct the knee-in-the-curve analysis. Instead, EPA conducted this analysis for *all* non-EGU source categories—with boilers representing just 166 of the 1,228 sources analyzed, including pipeline engines, glass and reheat furnaces, cement kilns, and municipal waste combustors. *See* Non-EGU Summary 9 [JA__]. EPA determined that the air quality benefits and costs for non-EGUs *as a whole* compared favorably to other control strategies. 88 Fed. Reg. at 36740.

*Fourth*, Petitioners are incorrect in asserting that the viability of the Rule's emissions allowance trading program depended on the participation of twenty-three States. *See* Br. 20, 42, 46-47. As a threshold matter, Petitioners are not covered by the trading program because they

do not operate power plants, and it is thus unclear how they are injured by objections to the trading program. In any event, the decision to include a trading program was not related to the number of States in the Rule. EPA has included trading programs for power plants in every good-neighbor rule that it has issued since 1998. Denial 27 n.28; *see, e.g.*, 63 Fed. Reg. 57356, 54756 (Oct. 27, 1998); see *supra* at 23. The market participants in emissions trading programs are the power plants themselves, not the States in which the power plants are located. Denial 29 [JA__]. And there is no evidence that these trading programs require power plants in a minimum number of States to function properly. Indeed, EPA currently operates a trading program that includes only Georgia's power plants. Denial 29 [JA__].

*Fifth*, Petitioners are incorrect that EPA's check for impermissible "overcontrol" depended on calculations involving twenty-three participating States. *See* Br. 50-51. EPA checked whether the Rule unlawfully overcontrolled upwind sources by assuming that sources in *all* linked States and "home" States (twenty-eight States total) would reduce emissions in a manner consistent with the Rule's requirements.

Denial 3, 22-23 & n.24 [JA__, __-__]. That analysis demonstrated that even this maximalist assumption did not result in overcontrol. Denial 22 [JA__]. Accordingly, a Rule with fewer participating States, and therefore fewer emissions reductions, could not conceivably result in overcontrol. Denial 22 [JA__].

## POINT II

### PETITIONERS ARE NOT ENTITLED TO THE REMEDIES THEY SEEK

Petitioners ask the Court to reverse and remand EPA's denial of reconsideration or, in the alternative, to vacate the underlying Rule. Br. 55. As explained above, there is no basis for reversing the denial of reconsideration. Nor would vacatur of the Rule be appropriate in any event because it is not authorized by the Act and would cause significant public health harms and regulatory burdens in downwind States.

The Clean Air Act does not permit the Court to vacate the underlying Rule in this reconsideration case. *See Portland Cement Ass'n v. EPA*, 665 F.3d 177, 185 (D.C. Cir. 2011). Instead, the only available remedy is to order EPA to convene a reconsideration proceeding. 42

U.S.C. § 7607(d)(7)(B). Vacatur is at odds with the statute's plain text, which specifies that "reconsideration shall not postpone the effectiveness of the rule" and that a reviewing court may stay the underlying rule during a reconsideration proceeding for 90 days at most. *See id.* These provisions demonstrate that Congress contemplated only a reconsideration proceeding, during which a court might stay the rule for a prescribed period. If Congress had intended to make vacatur available as a remedy, it would have said so.

Vacatur would be inappropriate here even if the statute authorized such a remedy (which it does not). In considering whether to vacate a rule, a court assesses "the seriousness of the [rule's] deficiencies" and "the disruptive consequences of an interim change." *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). This Court generally declines to vacate regulations "when doing so would risk significant harm to the public health or the environment." *Wisconsin*, 938 F.3d at 336. Accordingly, this Court's past practice when it has identified an error in a good-neighbor rule has been to remand without vacatur because vacatur would likely cause significant public and environmental

harm. *See, e.g.*, *id.*; *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008), modifying relief granted in 531 F.3d 896 (D.C. Cir. 2008).

The same principle applies here. *See* Regulatory Impact Analysis, EPA-HQ-OAR-2021-0668-1115 (RIA) 214-17 [JA___]. Vacatur would have devastating, disruptive consequences by causing years of delay. EPA would need to convene a new notice-and-comment proceeding and develop a new federal plan for each State that lacks an approved SIP. *See* 42 U.S.C. § 7410(c)(1), (k)(1)-(5)). Meanwhile, downwind States and millions of their residents would suffer as upwind sources continue emitting pollutants that contribute to both persistently high levels of ozone and dangerous ozone spikes downwind. *See EME Homer*, 572 U.S. at 496-97, 507-09, 511 n.14. For example, when fully implemented, the Rule will save up to 1,300 lives annually, and prevent thousands of hospital and emergency room visits, thousands of new asthma cases, and over a million incidents of asthma symptoms, among other benefits. RIA 215-16 [JA__-__]. And these harms to downwind States and their residents would be particularly inequitable because they would result from upwind pollution that could be remedied in some cases with a flick

of a switch, i.e., by using pollution-control equipment that is already installed. *See* 88 Fed. Reg. at 36738 (showing that sources in Ohio and West Virginia could reduce 1,154 and 554 tons of emissions annually, respectively, by using already-installed equipment).

Downwind States also urgently need emissions reductions because the ozone measurements for each passing ozone season get locked into and materially affect a State's legal attainment status under the Act. For example, due in part to ongoing significant contributions of pollution from upwind States, portions of Connecticut, Delaware, Maryland, New Jersey, New York, and Pennsylvania missed a 2024 attainment deadline, and EPA has now classified them as being in "serious" nonattainment of the 2015 ozone standards. *See* EPA, Nonattainment Areas for Criteria Pollutants (Green Book), 8-Hour Ozone (2015), Designated Area/State Information (current as of Sept. 30, 2024).[9] Such areas must attain the standards as expeditiously as practicable and no later than 2027, *see*, *e.g.*, 89 Fed. Reg. 61025, 61026 (July 30, 2024). Attainment status will be

[9] https://www3.epa.gov/airquality/greenbook/jbtc.html (last visited October 22, 2024)

determined by ozone levels measured during the 2024, 2025, and 2026 ozone seasons. *See* 40 C.F.R. §§ 50.19(b), (d).

Failing to meet attainment deadlines has severe repercussions for downwind States. For example, State Intervenors who miss the 2027 deadline would likely face reclassification to more severe levels of nonattainment, requiring further in-state emissions reductions. To achieve such reductions, State Intervenors would be required to impose more restrictive and costlier measures on their own sources, which are already stringently controlled, to compensate for pollution emitted by upwind sources. That outcome goes against the foundational purpose of the Good Neighbor Provision. *See Wisconsin*, 938 F.3d at 313, 315-18.

## CONCLUSION

This Court should deny the petitions for review.

Dated: Albany, New York
October 22, 2024

Respectfully submitted,

FOR THE STATE OF
NEW YORK

LETITIA JAMES
Attorney General

/s/Claiborne E. Walthall[10]
CLAIBORNE E. WALTHALL
Assistant Attorney General
The Capitol
Albany, NY 12224
(518) 776-2380
claiborne.walthall@ag.ny.gov

BARBARA D. UNDERWOOD
*Solicitor General*
JUDITH N. VALE
*Deputy Solicitor General*
ELIZABETH A. BRODY
*Assistant Solicitor General*
MORGAN A. COSTELLO
*Assistant Attorney General*
of Counsel

[10] Counsel for the State of New York certifies that the other parties listed in the signature blocks consent to this filing.

FOR THE STATE OF
CONNECTICUT

WILLIAM TONG
Attorney General of Connecticut

*/s/ Jill Lacedonia*
JILL LACEDONIA
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5250
Jill.Lacedonia@ct.gov

FOR THE STATE OF
DELAWARE

KATHLEEN JENNINGS
Attorney General of Delaware

/s/ *Vanessa L. Kassab*
IAN R. LISTON
VANESSA L. KASSAB
Deputy Attorneys General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov
vanessa.kassab@delaware.gov

FOR THE DISTRICT OF
COLUMBIA

BRIAN L. SCHWALB
Attorney General of the
District of Columbia

*/s/ Caroline S. Van Zile*
CAROLINE S. VAN ZILE
Solicitor General
Office of the Attorney General for the
District of Columbia
400 6th Street N.W., Ste 8100
Washington, D.C. 20001
Tel. (202) 724-6609
caroline.vanzile@dc.gov

FOR THE STATE OF
ILLINOIS

KWAME RAOUL
Attorney General

*/s/Jason E. James*
JASON E. JAMES
Assistant Attorney General
MATTHEW DUNN
Chief, Environmental
Enforcement/
Asbestos Litigation Division
Illinois Office of the Attorney
General
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(217) 843-0322
jason.james@ilag.gov

FOR THE STATE OF
MARYLAND

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ Michael F. Strande*
MICHAEL F. STRANDE
Assistant Attorney General
STEVEN J. GOLDSTEIN
Special Assistant Attorney General
Office of the Attorney General
1800 Washington Blvd.
Baltimore, MD 21230
(410) 537-3421
Michael.strande@maryland.gov
sgoldstein@oag.state.md.us

FOR THE COMMONWEALTH
OF MASSACHUSETTS

ANDREA JOY CAMPBELL
Attorney General of
Massachusetts

*/s/ Jillian M. Riley*
JILLIAN M. RILEY
JOHN S. CRAIG
JULIA JONAS-DAY
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2424
jriley@mass.gov

FOR THE STATE OF
NEW JERSEY

MATTHEW J. PLATKIN
Attorney General of New Jersey

*/s/Nell Hryshko*
NELL HRYSHKO
Deputy Attorney General
Division of Law
25 Market St., P.O. Box 093
Trenton, NJ 08625
Telephone: (609) 376-2735
nell.hryshko@law.njoag.gov

FOR THE COMMONWEALTH
OF PENNSYLVANIA

MICHELLE A. HENRY
Attorney General

*/s/ Ann R. Johnston*
ANN R. JOHNSTON
Assistant Chief Deputy Attorney General
Office of the Attorney General
Civil Environmental
Enforcement Unit
Strawberry Square, 14th Floor
Harrisburg, PA 17120
ajohnston@attorneygeneral.gov
717-497-3678

FOR THE STATE OF WISCONSIN

JOSHUA L. KAUL
Attorney General of Wisconsin

/s/ Gabe Johnson-Karp
GABE JOHNSON-KARP
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53702-7857
Telephone: (608) 267-8904
Fax: (608) 267-2223
johnsonkarpg@doj.state.wi.us

FOR HARRIS COUNTY, TEXAS

CHRISTIAN MENEFEE
Harris County Attorney
JONATHAN FOMBONNE
First Assistant County Attorney
TIFFANY BINGHAM
Managing Counsel

/s/ Sarah Jane Utley
SARAH JANE UTLEY
Environmental Division Director
State Bar No. 24042075
1019 Congress, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5124
Fax: (713) 437-4211
Email:
sarah.utley@harriscountytx.gov

/s/ Zachary M. Fabish
Zachary M. Fabish
Sierra Club
50 F Street NW, 8th Floor
Washington, DC 20001
(650) 388-8446
zachary.fabish@sierraclub.org

Joshua D. Smith
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5560
(415) 977-5704
joshua.smith@sierraclub.org
*Counsel for Sierra Club*

/s/ Shaun A. Goho
Shaun A. Goho
Hayden W. Hashimoto
Clean Air Task Force
114 State Street, 6th Floor
Boston, MA 02109
(617) 678-2516
sgoho@catf.us
hhashimoto@catf.us

*Counsel for Citizens for Pennsylvania's Future, Clean Air Council, Clean Wisconsin, and Ohio Environmental Council*

_/s/ Megan M. Herzog_
Megan M. Herzog
Sean H. Donahue
Donahue & Goldberg, LLP
1008 Pennsylvania
Washington, DC 20003
(650) 353-8719
megan@donahuegoldberg.com
sean@donahugoldberg.com

Vickie L. Patton
Noha Haggag
Environmental Defense Fund
2060 Broadway, Suite 300
Boulder, CO 80302
(202) 572-3286
vpatton@edf.org
nhaggag@edf.org

*Counsel for Environmental Defense Fund*

_/s/ Seth L. Johnson_
Seth L. Johnson
Kathleen L. Riley
Earthjustice
1001 G Street NW, Suite 1000
Washington, DC 20001
(202) 797-5245
(202) 745-5227
sjohnson@earthjustice.org
kriley@earthjustice.org

*Counsel for Air Alliance Houston, Appalachian Mountain Club, Center for Biological Diversity, Chesapeake Bay Foundation, Downwinders at Risk, Sierra Club, Southern Utah Wilderness Alliance, and Utah Physicians for a Healthy Environment*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Claiborne E. Walthall, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,481 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7), corresponding local rules and this Court's Order (July 30, 2024), Document #2067416.

Dated: Albany, New York
October 22, 2024

/s/Claiborne E. Walthall

## CERTIFICATE OF SERVICE

I hereby certify that, on October 22, 2024, I electronically filed the foregoing Proof Brief and attached Statutory Addendum using the Court's CM/ECF system and that, therefore, service was accomplished upon counsel of record by the Court's CM/ECF system.

Dated: Albany, New York
October 22, 2024

/s/Claiborne E. Walthall

**ORAL ARGUMENT NOT YET SCHEDULED**

**24-1172**
**(and consolidated case)**

---

# United States Court of Appeals for the District of Columbia Circuit

UNITED STATES STEEL CORPORATION,

*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents*,

On Petitions for Review of Final Action
by the United States Environmental Protection Agency

---

## STATUTORY AND REGULATORY ADDENDUM

---


BARBARA D. UNDERWOOD
*Solicitor General*
JUDITH N. VALE
*Deputy Solicitor General*
ELIZABETH A. BRODY
*Assistant Solicitor General*
MORGAN A. COSTELLO
CLAIBORNE E. WALTHALL
*Assistant Attorneys General*
*Environmental Protection Bureau*

*of Counsel*

LETITIA JAMES
*Attorney General*
*State of New York*
State Capitol
Albany, New York 12224
(518) 776-2400


Dated: October 22, 2024

## TABLE OF CONTENTS

40 C.F.R. § 50.19 .......................................................................... ADD-1

This content is from the eCFR and is authoritative but unofficial.

## Title 40 —Protection of Environment
## Chapter I —Environmental Protection Agency
## Subchapter C —Air Programs
## Part 50 —National Primary and Secondary Ambient Air Quality Standards

**Authority:** 42 U.S.C. 7401, *et seq.*

**Source:** 36 FR 22384, Nov. 25, 1971, unless otherwise noted.

## § 50.19 National primary and secondary ambient air quality standards for ozone.

(a) The level of the national 8-hour primary ambient air quality standard for ozone ($O_3$) is 0.070 parts per million (ppm), daily maximum 8-hour average, measured by a reference method based on appendix D to this part and designated in accordance with part 53 of this chapter or an equivalent method designated in accordance with part 53 of this chapter.

(b) The 8-hour primary $O_3$ ambient air quality standard is met at an ambient air quality monitoring site when the 3-year average of the annual fourth-highest daily maximum 8-hour average $O_3$ concentration is less than or equal to 0.070 ppm, as determined in accordance with appendix U to this part.

(c) The level of the national secondary ambient air quality standard for $O_3$ is 0.070 ppm, daily maximum 8-hour average, measured by a reference method based on appendix D to this part and designated in accordance with part 53 of this chapter or an equivalent method designated in accordance with part 53 of this chapter.

(d) The 8-hour secondary $O_3$ ambient air quality standard is met at an ambient air quality monitoring site when the 3-year average of the annual fourth-highest daily maximum 8-hour average $O_3$ concentration is less than or equal to 0.070 ppm, as determined in accordance with appendix U to this part.

*[80 FR 65452, Oct. 26, 2015]*